IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DANIEL P. OSWALD,

                Plaintiff,                      OPINION AND ORDER

    v.

                                                   15-cv-291-wmc

WILLIAM POLLARD, *et al.*,

                Defendants.

      *Pro se* plaintiff Daniel P. Oswald was screened to proceed in this lawsuit on varous

claims related to his 2014 fall down a flight of stairs while incarcerated at the Waupun

Correctional Institution ("Waupun"). (Dkt. #28.) Now before the court is defendants'

motion for summary judgment. (Dkt. #73.) For the reasons that follow, that motion will

be granted.

UNDISPUTED FACTS[1]

I.    **Parties**

      Between 2014 and 2015, plaintiff Oswald was a prisoner at Waupun. Defendant

Belinda Schrubbe was the Health Services Unit ("HSU") Manager; defendant Kristine

DeYoung was a registered nurse; defendant Mark Charles was a Psychological Services Unit

("PSU") Associate; defendant Lesley Chapin (previously known as Baird) was a

Psychologist Supervisor; defendant Jeremy Brockman was a correctional officer; and

defendant Brian Greff was a Corrections Program Supervisor.

---

[1] The following facts are drawn from the parties' proposed findings of fact and supporting evidence. Unless otherwise noted, these facts are material and undisputed when viewed in a light most favorable to Oswald.

## II.    Segregation Unit Hygiene Policies

Within Waupun's walls is a Health and Segregation complex split into two parts: the Health Services Unit and the Segregation (or Restrictive Housing) Unit. In the Segregation Unit, showers are located on the lower level, and cells are located on either the upper or lower level. The North Cell Hall is used for overflow purposes when the Segregation Unit is full. A multi-story building, the main floor of North Cell Hall, which has no elevator, has both a high and low side.

On Wednesdays and Saturdays, prisoners housed in North Cell Hall may shower in the Bathhouse, which is located on the low side of the main floor, and then receive a change of clothing. Prisoners are required to shower at least once a week. While prisoners may opt to wash themselves using the sink in their cells, the Segregation Unit handbook warns prisoners that if they do not maintain proper hygiene, then they may be forced to shower. On Saturdays, prisoners are also offered cleanings supplies for their cells.

In addition, prisoners in the North Cell Hall receive clean linens each Wednesday, which includes two sheets, one hand towel, one face cloth and one pillowcase. Prisoners may even receive linens more frequently provided the Special Needs Committee or a designated nurse deem it appropriate in a written "medical restriction." In making that decision, the views of both medical and security personnel are considered to ensure that the restriction is both medically necessary and authorized in a manner that addresses any potential security risks.

### III.     Oswald's Fall

Oswald was housed in the North Cell Hall between March 25 and July 17, 2014. To reach the showers, Oswald had to descend two flights of stairs, consisting of 11 to 12 stairs. On June 28, 2014, Officer Brockman moved Oswald out of his cell to transport him to the Bathhouse. In doing so, Brockman placed Oswald in restraints behind his back and began walking with him using the so-called "hands-on" escort hold, in which the officer controls the prisoner's movements by walking at his side while holding the upper arm.

Although they dispute exactly how it occurred, the parties agree that as Brockman was escorting him to the showers, Oswald fell down a flight of stairs. According to Brockman, Oswald dropped his washcloth as they approached a landing before a flight of stairs, prompting Brockman to direct Oswald to remain still, so that Brochman could pick up the washcloth for Oswald. Instead, Oswald supposedly disobeyed orders and he kept walking towards the stairs. For his part, Oswald claims that he did not have a washcloth at the time, so he obviously did not drop one. (Oswald decl. (dkt. #88) ¶ 7.) Rather, Oswald avers that he lost his balance when he started descending the stairs, at which point Brockman "released" his arm and "allowed" him to fall down approximately twelve steps. (*Id.* ¶¶ 8-9.) After the fall, the parties agree that Brockman immediately called for help, and staff assisted Oswald to his feet, placed him in a wheelchair and took him to the HSU for evaluation.

## IV.    Medical Treatment for Fall

In the HSU, a nurse examined Oswald, who reported hitting his head, back, arms and shoulders when he fell.  Oswald also reported that he lost consciousness briefly, but denied losing control of his bowel and bladder.  The nurse assessed Oswald with a right arm abrasion and potential complications from a head injury.  His arm was cleaned, patted dry and Bacitracin ointment was applied.

HSU staff then sent Oswald to Waupun Memorial Hospital for further assessment.  At the hospital, Oswald reported a headache, neck pain, lower back pain and left ankle pain, but he denied numbness/tingling or weakness in his upper or lower extremities.  To alleviate his pain, the doctor gave Oswald 30 mg of Toradol and two morphine administrations, both intravenously.  The doctor also ordered x-rays and a CT scan.  The CT scan showed no evidence of intracranial hemorrhage or fracture or of acute cervical spinal injury.  Oswald's ankle x-ray also showed no acute findings, and his chest x-ray showed no significant finding for his bones or soft tissues.  Accordingly, the doctor at the hospital diagnosed Oswald with a concussion, and he recommended that Oswald follow up on Monday and return if he vomited or experienced focal weakness.

On June 28 and 29, 2014, Oswald submitted Health Service Requests ("HSR") in which he reported continued pain and vomiting.  On June 30, Nurse DeYoung saw Oswald in the HSU, and Oswald claims that she denied him an ice bag, a lower tier, a wheelchair, and medication for pain.  That same day, however, Oswald does not dispute that he was prescribed 325 mg of acetaminophen, two tablets, four times a day, as needed for pain, as well as 500 mg of naproxen two times a day, as needed.  It appears that Oswald was

provided with a wheelchair for some period of time after his fall, and that he was diagnosed with and treated for vertigo, but it is not apparent from the parties' submissions exactly who issued him a wheelchair or how long he used it.[2]

A few months later, on September 15, 2014, Oswald fell down stairs again, apparently due to anxiety about stairs, and Nurse DeYoung again examined him. DeYoung did not find any abnormalities or injuries, and because Oswald was already prescribed pain medication, she decided to provide him with education about fall prevention and to follow up with a doctor in fourteen days.

Oswald does not dispute that he was seen by either off-site or Waupun medical clinicians over 20 times between June and December of 2014. During those appointments, his medications were reviewed and adjusted; he underwent MRI's of his lumbar spine on August 1 and August 26 at UW Health; and his medical providers consistently followed the recommendations of off-site orthopedic specialists. Nevertheless, Oswald continues to report severe back pain. While he avers that he suffers from migraines, "bulging discs, sciatica, and daily muscle cramps," (Oswald decl. (dkt. #88) ¶ 2), he cites to no medical records of a physician diagnosis confirming that assertion.

In addition to his physical pain after the fall, Oswald developed anxiety related to taking stairs, which rendered him incontinent. On July 1, 2014, Oswald urinated on

---

[2] While Oswald claims that Dr. Manlove, HSU Manager Schrubbe and Nurse DeYoung agreed that a wheelchair was appropriate on August 5, 2014, the evidence he cites does not support a finding that these three defendants made a decision about his access to a wheelchair. (Exs. 105a, 105b (dkt. #89-1) at 3-4.) Instead, Oswald cites progress notes and an HSR from August 5, but those documents show that Oswald was having pain when he moved and, indeed, had been using a wheelchair; neither document reflects a decision made by Manlove, Schrubbe or DeYoung to issue him a wheelchair.

himself while he was escorted down the staircase he had fallen down. As a result, Oswald made efforts throughout July of 2014 to either (1) avoid having to take the stairs or (2) obtain additional help for his incontinence. Oswald first discussed his incontinence with his psychologist, Dr. Charles, at the beginning of July. On July 8, 2014, Dr. Charles advised Schrubbe of Oswald's incontinence in an email, and the next day, July 9, Schrubbe instructed Dr. Charles to tell Oswald to contact HSU about this issue.

On July 10, 2014, an HSU nurse signed a Medical Restrictions/Special Needs Form that allowed Oswald to have an extra bath towel and an extra washcloth to wash himself. On July 13, 2014, HSU received an interview/information request from Oswald, complaining about a lack of clean bedding and inability to shower and requested a restriction requiring him to be handcuffed in front of his body. On July 15, 2014, Oswald was seen in the HSU where he complained of a rash and incontinence. The HSU staff member that examined him did not see a rash, only a small amount of dry skin. Nevertheless, Oswald received ointment and was ordered briefs for incontinence. Staff also noted that (1) Oswald already had access to an extra washcloth and bath towel for washing himself, and (2) a front cuff restriction was not medically necessary.

As a result of that visit, when DeYoung and Schrubbe reviewed Oswald's July 13 request, they determined that those issues had been adequately addressed. Following the visit, Oswald's restriction was updated to include incontinence briefs and bedding, to last until August 10, 2014.[3] Finally, on July 17, DeYoung rejected Oswald's request for a front cuff

---

[3] On July 24, the form was updated yet again to extend all of those accommodations through December 5, 2014. On December 5, DeYoung renewed the restriction for clean linen as needed until March 5, 2015.

restriction, explaining that other professionals had already determined that a front cuff restriction was not medically necessary.

## V.  Oswald's Requests for Elevator Access

Following his fall, Oswald submitted multiple requests to the HSU to address his pain.  On July 26, 2014, HSU Manager Schrubbe received an information request from Oswald complaining about being denied a cane and placement in the lower tier of North Cell Hall.  That day Schrubbe responded that his requests had already been granted, subject to "further work up."  (Ex. 1007 (dkt. #77-2) at 295.)  Oswald responded by apologizing to Schrubbe, explaining that he submitted the request before learning that he received the restriction.  On September 11, 2014, Schrubbe received another information request in which Oswald requested an elevator pass due to dizzy spells.  While Oswald insists that Schrubbe could have acted immediately on his request, Schrubbe avers that special needs requests cannot be resolved until the Special Needs Committee meets at the beginning of the month.  Schrubbe further avers that if a medical provider indicated that he was physically incapable of taking the stairs, Schrubbe would have recommended his transfer out of Waupun, but there was no such recommendation.[4]

---

[4] Oswald disputes this, claiming that a UW-Madison specialist from the spinal clinic recommended that he not take the stairs.  However, the evidence he cites in support, "Ex. 28 AA," does not support his assertion.  First, none of Oswald's exhibits was labeled "Ex. 28 AA," although he did include an "Exhibit AA," which could be the evidence he cites.  Second, even that exhibit does not create an issue of fact as to whether a UW-Madison specialist recommended he use the elevator prior to September of 2014, since Exhibit AA is a Reasonable Modification/Accommodation Request form dated *December 3*, 2014.  (Ex. AA (dkt. #89-1) at 18.)  Although Oswald requested an elevator pass on the form, he does not reference a specialist's recommendation for an elevator pass.  At least for purposes of summary judgment, the court will accept Schrubbe's statement that no medical personnel recommended that Oswald take the elevator because he was not physically capable of taking the stairs.

Regardless, on October 1, 2014, the Special Needs Committee, comprised of Schrubbe, Gregg and Nicole Kamphius, met and approved Oswald for a lower tier and elevator pass. The committee agreed that the lower tier and elevator pass was to be valid for six months, or until June 5, 2015. The Special Needs Committee also sent Oswald a memorandum notifying him of its approval. Finally, Schrubbe responded to Oswald's September 11 information request, elaborating that the Special Needs Committee approved the elevator pass due to Oswald's reported vertigo/dizziness, which made taking some of Waupun's wider staircases difficult, because he would be unable to hold both sets of railings to help with balance.

On November 13, 2014, Oswald was placed in the Restrictive Housing Unit. On November 17, Schrubbe cancelled his elevator pass because: Oswald was physically capable of using the stairs; there were not as many steps in that unit; and the purpose of the elevator pass -- to avoid the effects of dizziness and vertigo on staircases -- was not present in the Restrictive Housing Unit, where policy required Oswald to be transported via the hands-on escort. When Oswald returned to general population, he resumed using the elevator.

## VI. Oswald's Mental Health Treatment

Simultaneous to receiving treatment from the HSU for pain and incontinence, Oswald was receiving consistent treatment from the PSU for his mental health needs. At each institution, PSU staff evaluate prisoners at intake, and assign them a mental health classification code, ranging from MH-0 (no current mental health need) through MH-2a

(inmate has a serious mental illness based on a health need) or MH-2B (inmate has a serious mental health illness based on Axis II, such as psychosis or self-injurious behavior).

In addition to clinical contact, PSU staff visit prisoners housed in the Restrictive Housing Unit on a routine basis by stopping by their cell front and talking with them. If prisoners need additional attention beyond their scheduled appointments, they may also submit a Psychological Services Request ("PSR") or contact their unit staff about immediate mental health needs. PSU triages PSRs daily and endeavors to respond to any PSR within three working days of its receipt.

During the relevant time period, Oswald had a mental health code of MH-1, meaning that he receives mental health services, but he does not suffer from a diagnosed mental illness. Prisoners with a MH-1 code are required to see PSU staff at least once every six months. While various PSU staff members were involved in his psychological care, Oswald's claims in this case focus on how Dr. Charles, Dr. Chapin and Manager Schrubbe handled his mental health treatment needs.

## A. Dr. Charles

From June 30, 2014, to approximately January of 2016, Dr. Charles was Oswald's primary assigned clinician, although Dr. Chapin and Dr. Callister (Oswald's psychiatrist) also communicated about Oswald's incontinence and anxiety issues during this period. Dr. Charles first learned about Oswald's fall two days after it happened, on June 30, 2014, because Oswald submitted a PSR complaining that he had a flashback to the fall and woke up sweating with pain in his chest. Dr. Charles wrote back that an appointment had been scheduled for that week. (Ex. 1006 (dkt. #77-1) at 103.)

Oswald and Dr. Charles met a few days later, on July 3, 2014, when Oswald reported extreme anxiety whenever he had to walk down stairs, as well as incontinence issues. Oswald further reported that he had been prevented from showering following the incident, and he had wet himself during a transport. At that time, Dr. Charles diagnosed Oswald as "R/O Acute Stress Disorder Anti-Social Personality Disorder," (Ex. 1006 (dkt. #77-1) at 17), meaning that Charles wanted to rule out acute stress disorder and anti-social personality disorder. As a result, Charles provided Oswald with strategies to help reduce his anxiety regarding stairs, including deep breathing exercises, safe place visualizations and grounding exercises to help with flashbacks. Charles further suggested reducing his fluid intake at night and using the bathroom to avoid bed wetting. Charles avers that he would have suggested these strategies to any patient presenting with Oswald's symptoms.

Following Dr. Charles' early July appointment communications with Oswald about his incontinence, he saw Oswald for additional appointments on July 25, August 1, August 13, August 19, September 15, September 23, November 13, December 22 of 2014, and February 18, May 29, June 10, and December 7 of 2015. (Ex. 1006 (dkt. #77-1) at 2-17.) When Oswald was in the Restrictive Housing Unit, Charles also saw him during his weekly rounds. During the course of these appointments, Charles' diagnoses for Oswald changed, although he never formally diagnosed Oswald with Post-Traumatic Stress Disorder ("PTSD"), and Charles repeatedly noted that Oswald was having difficulty with the recommended exercises.

After the August 1, 2014, appointment, Dr. Charles changed Oswald's diagnosis to rule out PTSD, because more than one month had passed since his fall but Oswald was

still experiencing stairs-related anxiety. At that appointment, Dr. Charles suggested that Oswald join an anxiety group that was handled by Dr. Boiven. Unfortunately Oswald was not able to participate in that group because Dr. Boiven took an extended medical leave shortly after this appointment.

Drs. Charles and Chapin met with Oswald together on February 18, 2015. After that meeting, Dr. Charles changed his diagnosis to "Unspecified Trauma and Stressor Related Disorder." Charles made this change after receiving contradictory reports from staff indicating that Oswald was not actually avoiding stairs. He also noted his concern that Oswald did not meet all the necessary components of PTSD. (Ex. 1006 (dkt. #77-1) at 8.) Drs. Chapin and Charles further discussed a treatment plan with Oswald, and Chapin explained that Oswald needed to adopt reasonable expectations for the frequency of appointments.

Beyond ongoing appointments with Oswald between June of 2014 and November of 2015, Dr. Charles also responded to numerous PSRs that Oswald submitted asking to be seen. (Ex. 1006 (dkt. #77-1) at 22-35, 37, 42-43, 45-47, 49, 53-56, 62, 64-65, 69, 72-75, 81-82, 85-86, 88-89, 91, 93, 96-103.) In many of his responses Charles noted that Oswald either had an upcoming appointment or was recently seen, but he also reminded Oswald about the tools that Oswald should use to deal with his anxiety, such as relaxation exercises, grounding activities and other behavioral strategies.

Despite Oswald's claims that he completed these exercises to the best of his ability, Charles wrote a memorandum to Oswald in May of 2015, explaining that that Oswald appeared to have failed to complete the exercises suggested for him, and reminding Oswald

that if he wanted to improve, he would need to follow those recommendations. (Ex. 1009 (dkt. #79-1) at 18-21.) Additionally, in November of 2015, when Dr. Charles learned that Oswald filed an inmate complaint claiming that Charles had not seen him in two months, and that he had been denying him mental health care, Charles prepared a memorandum for the inmate complaint examiner summarizing Oswald's history and treatment timeline. In it, Charles explained that he did not meet with Oswald between February and May of 2015 because: (1) Oswald had been refusing to complete the exercises that Charles recommended; and (2) Charles had received reports that Oswald had been successfully using the stairs without incident.

### B.    Dr. Chapin

Dr. Chapin was the supervisor of the PSU during the relevant time period. It was not part of her routine to review PSRs. As a result, Chapin only learned about Oswald's incontinence and anxiety related to stairs when Oswald wrote her a letter dated July 13, 2014, complaining that his anxiety issues were not being taken seriously, and he was being forced to live in filth. On July 16, 2014, Chapin responded to him, writing that she had spoken to Dr. Charles and did not believe that Charles was neglecting him. To the contrary, Chapin explained that she believed Dr. Charles was doing a very good job consulting with and notifying individuals about Oswald's mental health issues. Finally, Dr. Chapin noted that the best approach for Oswald to handle his anxiety was to address and manage his symptoms directly rather than to avoid the stairs.

About a month later, Oswald wrote Dr. Chapin another letter, this time reporting that other PSU issues were not being properly addressed and that he was still wetting the

bed multiple times a night. While Dr. Chapin was away from the institution from August 13 to August 25, 2014, she reviewed Oswald's file after returning and concluded that Dr. Charles had been meeting with Oswald regularly and attempting to offer him treatment. As such, Chapin wrote a memorandum to Oswald that day advising him to keep working with Dr. Charles on systematic desensitization, a therapeutic method used to diminish anxiety. (Ex. 1006 (dkt. #77-1) at 76.) With respect to Oswald's bed-wetting in particular, Chapin reminded him of the recommendation that he limit his fluid and caffeine intake to decrease his bed-wetting, noting that because his bladder control was more likely a physical, not mental, health issue, limiting liquids may resolve this issue.

On October 3, 2014, Oswald directed a PSR to Dr. Chapin. In it, Oswald requested a transfer to the Wisconsin Resource Center ("WRC"). Dr. Chapin responded on October 8, 2014, stating that she had been closely reviewing his treatment records and did not believe that he was being neglected. (Ex. 1006 (dkt. #77-1) at 68.) In her opinion, a referral to the WRC was unnecessary because Oswald was receiving adequate care at Waupun, plus Oswald's desire to be seen every day was simply not realistic or consistent with Waupun's practices. Chapin further explained that regardless of this opinion, it was not her decision to make because WRC referrals must be made by supervisory staff and security, and in any event, *WRC* staff decides whether to accept new patients, not Waupun.

Instead of pursuing a WRC transfer, Dr. Chapin ultimately decided to refer Oswald to Waupun's clinician specializing in trauma treatment, Dr. Johnston, in September 2014. In Chapin's view, this would allow Dr. Johnston to assess whether Oswald could benefit

13

from participating in her trauma group. Chapin further explains that this group work "mirrors" the approach taken at the WRC, and at that time, Dr. Johnston had plans to start a new trauma group. Unfortunately, Dr. Johnston left Waupun in February of 2015, before he was able to actually evaluate Oswald.

### C. HSU Manager Schrubbe

While Oswald is not proceeding on a claim against his psychiatrist, Dr. Callister, Oswald complains about Schrubbe's handling of his complaint about the anxiety medication prescribed to him. As a result, the timeline of his prescriptions is relevant to his claim against her. Between August of 2014 and November of 2015, Dr. Callister prescribed Oswald multiple medications to treat his anxiety, including Hydroxyzine, Duloxetine, Fluoxetine, Paroxetine, and Trazodone, as well as Prazosin to address his incontinence.

Callister changed the anxiety medication when Oswald reported side effects, although on multiple occasions, Oswald simply refused to take the medications as prescribed. (Ex. 1007 (dkt. #77-2) at 323, 327, 334, 338; Oswald decl. (dkt. # 88) ¶ 21.) For example, on August 21, 2014, Dr. Callister noted that Oswald did not want to take his prescribed medication, Hydroxyzine, and that he told Callister that he needed something that would work for anxiety "right now." Dr. Callister also noted that Oswald threatened to complain about him if he did not prescribe the medication he needed. And on August 21, Schrubbe received an information request from Oswald in which he complained that he did not have access to anti-anxiety medication. In response, Schrubbe deferred to Dr. Callister, responding that anti-anxiety medication is available to Oswald, but it may not be

the exact type of medication he wants. As such, Schrubbe recommended that Oswald work with Dr. Callister to address his concern.

OPINION

The court granted Oswald leave to proceed on the following claims: (1) an Eighth Amendment deliberate indifference claim against defendant Brockman for allegedly failing to protect him from falling down stairs; (2) an Eighth Amendment medical deliberate indifference and state law negligence claims against defendant DeYoung for disregarding Oswald's subsequent need for treatment, pain medication and other care related to his fall; (3) an Eighth Amendment medical deliberate indifference and state law professional negligence claims against defendants Charles, Chapin and Schrubbe for failing to provide follow up treatment for his mental health issues following the fall; (4) an Eighth Amendment conditions of confinement claim against defendants Schrubbe, DeYoung, Chapin, Greff and Charles, for letting Oswald spend several days in urine-soaked clothes and linens; and (5) an ADA and Rehabilitation Act claim against the Department of Corrections itself for failing to accommodate his disability with an elevator pass. As an initial matter, Oswald concedes that judgment is appropriate as to his Eighth Amendment conditions of confinement claim against DeYoung, Charles, Chapin and Greff. (Pl. Br. (dkt. #85) at 11, n.4.) As to the remaining claims, judgment in defendants' favor is appropriate, even viewing the record and drawing all inferences in a light most favorable to Oswald.

I.      **Eighth Amendment Deliberate Indifference Against Officer Brockman for Fall**

The Eighth Amendment requires that prison officials "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (*quoting Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984). To state an Eighth Amendment failure to protect claim, a prisoner must allege that: (1) he faced a "substantial risk of serious harm"; and (2) prison officials acted with "deliberate indifference" to that risk. *Farmer*, 511 U.S. at 834. A substantial risk of serious harm is "so great" that it is "almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005). Defendants seek judgment on plaintiff's claim that Brockman acted with deliberate indifference on June 28, 2014.

At least for purposes of summary judgment, defendants agree that a risk of falling posed a substantial risk of serious harm, focusing their argument instead on Brockman's actions. While the parties dispute exactly what happened immediately before plaintiff's fall, even plaintiff's version of the facts does not support a finding of deliberate indifference. Plaintiff claims that he lost his balance and when he began falling, Brockman "released" his arm and "allowed" him to fall. Plaintiff does not include *any* additional facts suggesting that Brockman may have pushed him, deliberately let go of him or had reason to believe that plaintiff would lose his balance and fall down the stairs. Nor does he dispute that Brockman immediately called for help after plaintiff fell to ensure that he received immediate medical attention.

At worst, plaintiff's version of the facts would permit a reasonable jury to infer that as plaintiff was losing his balance, Brockman was passive -- he failed to maintain or regain

16

his grip on plaintiff to stop the fall. The most that a reasonable fact finder could find from these facts is that Brockman *negligently* released plaintiff from his grip and did not regain his hold on him. However, the Eighth Amendment does not shield prisoners from negligence, or even gross negligence; it protects prisoners from extreme, essentially criminal, recklessness. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Even gross negligence is insufficient to impose constitutional liability ....") (citation omitted). While plaintiff points out that Brockman's release of his arm broke Waupun's "hands on" policy, no facts permit an inference that Brockman acted intentionally or recklessly. Regardless, "ignoring internal prison procedures does not mean that a constitutional violation has occurred." *Lewis v. Richards*, 107 F.3d 549, 554 n.5 (7th Cir. 1997).

A few counterexamples highlight the differences between Brockman's passiveness and acts or omissions that could support a finding of deliberate indifference. In *Henard v. Green*, 10 F. App'x 357 (7th Cir. 2001), the Seventh Circuit concluded that factual disputes precluded summary judgment on an Eighth Amendment claim arising from a prisoner's fall down a flight of stairs. *Id.* at 360-61. In that case, however, an inmate averred that a prison officer required him to take the stairs with shackled arms and legs, even though the inmate told him that (1) he was having trouble breathing, (2) he was dizzy and weak, and (3) he needed a wheelchair. *Id.* In reversing and remanding the district court's grant of summary judgment, the Seventh Circuit concluded that if a jury accepted the inmate's version of events, it could reasonably conclude that the officer acted with deliberate indifference to the risk of substantial harm in requiring him to take the stairs. In contrast, the evidence of record here suggests that Brockman had little to no reason to know that

the plaintiff would fall and did nothing to prevent it. By all accounts, including plaintiff's, he was capable of taking the stairs with or without Brockman, although obviously more vulnerable with arms handcuffed behind him, and that Brockman was holding him properly until Brockman released him when plaintiff lost his balance.

Nor is this case like *Anderson v. Morrison*, 835 F.3d 681 (7th Cir. 2016), in which an inmate was required to take stairs while handcuffed behind his back despite the stairs being covered in milk, food and garbage, essentially creating an obstacle course. *Id*. at 683. In that case, the Seventh Circuit reversed the dismissal of an Eighth Amendment claim because the plaintiff alleged that the guards "refused to assist him" when it was apparent that he was incapable of steadying himself on the stairs and the mess on the stairs was likely easily preventable. *Id.* Here, on the other hand, plaintiff's version of the fall does not suggest that Brockman baulked at (much less, refused) an opportunity to help him before he fell. Rather, even under plaintiff's version of events, in a light most favorable to him, Brockman negligently faltered at the *moment* of his fall. Accordingly, the court will grant defendants' motion for summary judgment as to plaintiff's Eighth Amendment deliberate indifference claim against Brockman.[5]

---

[5] The court did not grant Oswald leave to proceed on a negligence claim against Brockman, and Oswald has never moved to amend his claims to include such a claim. Accordingly, the court sees no basis to conclude that Oswald intended to pursue a negligence claim against Brockman. *See Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012) (district court has discretion to deny request to amend complaint when the request involved undue delay and would result in prejudice). Regardless, having failed to offer proof of proper notice to the state of such a claim, plaintiff would almost certainly be time barred from pursuing that claim in federal court. *Sorenson v. Batchilder*, 2016 WI 34 ¶ 36, 368 Wis. 2d 140, 154, 885 N.W.2d 362, 368 (citing Wis. Stat. § 893.82(2m); *see also Weinberger v. Wisconsin*, 105 F.3d 1182, 1188 (7th Cir. 1997) ("Section 893.82 is jurisdictional and strict compliance is required.").

## II.     Eighth Amendment medical deliberate indifference

Next, defendants seek judgment in their favor on plaintiffs' claims that Nurse DeYoung, Dr. Charles, Dr. Chapin and HSU Manager Schrubbe were deliberately indifferent to his medical and mental health needs following his fall.  Prison employees violate an inmate's rights under the Eighth Amendment if they are "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  Here, defendant again does not dispute that plaintiff's injuries from the fall constituted a serious medical need.  Instead, they argue that the treatment provided did not constitute deliberate indifference as a matter of law.  Deliberate indifference is more than medical malpractice; the Eighth Amendment does not codify common law torts.  *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.")  In particular, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim.  *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

While deliberate indifference requires more than negligent acts, it also requires something less than purposeful acts.  *Farmer*, 511 U.S. at 836.   The point of division between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety," or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he both draws that inference and deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not

19

enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").  A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."  *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

The Seventh Circuit acknowledged in *Petties* the difficulty of applying this standard in the medical care context, outlining examples of conduct that could support a finding of deliberate indifference:  when a doctor refuses to take instructions from a specialist; when a doctor fails to following an existing protocol; when a provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or where the treatment involved inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31.  As the evidence of record does not support a finding by a reasonable trier of fact that Nurse DeYoung, Dr. Charles, Dr. Chapin or Manager Schrubbe's actions fell into any of these categories, summary judgment in their favor is appropriate.

## A.    Nurse DeYoung

Plaintiff has waived his opportunity to oppose defendants' motion as to DeYoung. In his opposition brief, while plaintiff acknowledged that defendants are seeking judgment

on claims against DeYoung, he did not actually argue that judgment in DeYoung's favor should not be granted, much less cite to any evidence in support of that position. While the court construes plaintiff's claims liberally in light of his *pro se* status, he still was obliged to respond to each of defendants' material factual findings and arguments to avoid judgment. *Central States Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived."); *Woods v. City of Rockford, Ill.*, 367 F. App'x 674, 677 (7th Cir. 2010) (plaintiffs waived theory because they did not raise arguments at summary judgment).

Moreover, this omission appears completely intentional for two reasons. First, there is nothing in the factual record to give plaintiff room to argue plausibly that DeYoung did anything amounting to deliberate indifference. At most, DeYoung might be criticized for not doing enough early in plaintiff's treatment, but this would not even permit a trier of fact to find negligence, much less deliberate indifference. Later, the medical treatment decisions were made by doctors, to whom Nurse DeYoung was entitled to defer. *Holloway v. Delaware Cty. Sheriff's Office*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions by treating physicians" unless "it is apparent that the physician's order will likely harm the patient.").

Second, in plaintiff's 16-page opposition brief, he addressed the remainder of defendants' arguments, specifically choosing to oppose defendants' arguments regarding the medical care he received from Dr. Charles, Dr. Chapin and Manager Schrubbe. Even after defendants pointed out this omission in their reply brief, plaintiff made no effort to correct or supplement the record, or to otherwise preserve his claim against DeYoung,

despite contacting the court for other reasons. Indeed, plaintiff is actively pursuing a deliberate indifference claim related to DeYoung's handling of his medical issues and access to the elevator starting in December 2014 in another lawsuit. *See Oswald v. Manlove*, Case No. 16-cv-991-PP (E.D. Wis. filed Nov. 23, 2016). Summary judgment in that case has been fully briefed, and plaintiff responded specifically to defendants' arguments regarding DeYoung's care. *Id.*, dkt. #111, at 13-17.

Given the lack of any factual basis to argue otherwise, and plaintiff's apparent deliberate decision not to oppose defendants' motion as to DeYoung, along with his obvious focus on DeYoung's treatment decisions in his Eastern District of Wisconsin case, plaintiff has waived any opposition to the entry of summary judgment in DeYoung's favor in this case.

### B.    Dr. Charles

Plaintiff's claims against Dr. Charles, Dr. Chapin and Manager Schrubbe challenge their decisions over a longer period of time following his fall down the stairs on June 28. However, even viewing plaintiff's version of these unfolding events in his favor, no reasonable trier of fact could find that any of these three defendants acted with deliberate indifference on this record. Indeed, in viewing their treatment as a whole, the evidence suggests that these health care providers made coordinated, consistent efforts to address plaintiff's ongoing physical and psychological complaints. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (courts must "examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs").

In particular, Dr. Charles interacted with plaintiff repeatedly, in writing and in person, between his June 28, 2014, fall and November of 2015. When he first learned about the fall and plaintiff's reports of flashbacks and anxiety, Dr. Charles arranged to see him within a few days, and the two met in accordance with that plan on July 3, 2014. At that point, Dr. Charles discussed with plaintiff several methods for reducing his anxiety as he approached stairs, and he discussed ways that plaintiff could avoid bed-wetting. Afterwards, when plaintiff reported continued bed-wetting and requested a "pee sheet" and adult diapers, he asked HSU Manager Schrubbe to provide them. Thereafter, in addition to reinforcing his recommendations in response to plaintiff's PSRs, Dr. Charles met with plaintiff for *twelve* more appointments between July of 2014 and December of 2015. Plus, Charles saw plaintiff on at least a weekly basis while he was assigned to the Restrictive Housing Unit. The contemporaneous records of those meetings show that Charles *repeatedly* attempted to impress upon plaintiff the importance of following through with the exercises that he recommended to him for his anxiety triggers, but that plaintiff often failed to complete them. While plaintiff insists that completing those exercises triggered his anxiety, Dr. Charles held the professional opinion that plaintiff should continue attempting to work through the recommended visualization and relaxation tools and that plaintiff should reduce his fluid intake, as his bed wetting did not appear to be psychologically-driven. Even if mistaken, these opinions do not support a finding of deliberate indifference.

Plaintiff also takes issue with the fact that Dr. Charles did not see plaintiff every time he submitted a PSR, but there is no evidence suggesting that Dr. Charles was

deliberately indifferent in failing to do so. For instance, between June 29 and July 15, while Dr. Charles apparently did not see plaintiff, he responded to ten PSRs and/or HSRs about his consistent bed-wetting. (Ex. 1006 (dkt. #77-1) at 91-103.) Moreover, during such gaps of time, plaintiff was still receiving his medications as prescribed, and he had access to the materials and techniques Dr. Charles had provided him to deal with his anxiety. Beyond his own assertion that Dr. Charles should have seen him every time he submitted a PSR, plaintiff has offered no evidence to conclude that this is so, much less that such a failure amounts to deliberate indifference despite the overwhelming evidence that Charles *was* regularly seeing the plaintiff and providing ongoing treatment.

To be fair, plaintiff accurately points out a single, larger gap between meetings from February to May of 2015, but a reasonable fact finder could not infer deliberate indifference from that lone lapse. As an initial matter, the context of this lapse is important: it started after the February 19 meeting plaintiff had with Drs. Charles and Chapin, after Dr. Charles had learned that plaintiff was taking stairs, and after Dr. Chapin and he both told plaintiff that he could not expect to see PSU staff every time he asked for it. As importantly, plaintiff was *still* interacting with Dr. Charles during this time. In addition, on March 9, Dr. Charles explained that he had not seen him lately because he was backed up due to the increase in clients and reduction in staff, and he reminded plaintiff that: "the majority of the work is done outside of the office. Focusing on relaxation activities should benefit you. I will do my best to send you some useful info and see you in person as soon as possible." (*Id.* at 37.) Then, on March 11, plaintiff submitted two PSRs to Dr. Charles, again asking for trauma materials, to which Dr. Charles

responded by enclosing those materials and explaining that he was doing his best to respond to plaintiff's requests in a timely fashion, but it took time to both respond to his requests and gather materials he had requested.  (*Id*. at 33-34.)

On March 27, 2015, plaintiff complained again to Dr. Charles that he had not been seen since February 18, to which Charles again responded that they were short-staffed, but also that he had spoken to Dr. Callister, who reported that plaintiff was doing better and that plaintiff was taking stairs better and had not been reporting panic attacks.  Dr. Charles added that he would put plaintiff on the schedule for the following week.  (*Id*. at 31-32.) On April 8, plaintiff submitted another PSR, asking why he had not been seen for six or seven weeks, and Dr. Charles responded that he would schedule plaintiff for that upcoming week.  Finally, in May, Dr. Charles responded to a PSR by writing that he was concerned because plaintiff had sent back the materials and worksheets he had provided, which indicated that *plaintiff* was the one unwilling to participate in therapy.  (*Id*. at 28-29.) When even this failed to elicit a positive response, Charles again saw plaintiff in person.

This record belies plaintiff's assertion that Dr. Charles failed to respond to his requests for treatment, much less was acted with deliberate indifference.  To the contrary, their correspondence shows not only that Dr. Charles was providing plaintiff with advice in his written responses, was providing plaintiff with tools to combat his anxiety, and was encouraging him to learn to manage his anxiety and incontinence issues on his own. Furthermore, while Dr. Charles admits that he did not meet with him from February until May, plaintiff's classification code (MH-1) required him to be seen only every six months. In any event, Dr. Charles avers that he did not pursue appointments with plaintiff because

he had displayed hostility towards his approach and, according to Dr. Callister, had shown signs of improvement because he was seen using the stairs without trouble.

Even if the trier of fact might accept that there was a chance that in-person meetings during this time could have helped plaintiff, the evidence of record would not support a finding that Dr. Charles acted with deliberate indifference to plaintiff's psychological needs. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006))).

None of plaintiff's other arguments in opposition are persuasive either. First, plaintiff argues that Dr. Charles acted with deliberate indifference because plaintiff never actually attended Dr. Boiven's anxiety group, but nothing in the record suggests that Dr. Charles had control over Dr. Boiven's schedule, nor that he had reason to know Dr. Boiven would be unavailable for so long. Second, plaintiff also takes issue with the fact that Dr. Charles never diagnosed him with PTSD, but Dr. Charles' decision not to diagnose him formally with PTSD was grounded in facts plaintiff does not dispute: Dr. Charles received reports that plaintiff was taking the stairs without problem. Moreover, in eventually ruling out PTSD, Dr. Charles did not discount his symptoms; rather, he diagnosed plaintiff more generally with "Unspecified Trauma and Stressor Related Disorder." Third, and finally, plaintiff claims that Dr. Charles persisted in ineffective treatment. However, the record shows that Dr. Charles' treatment plans were not stagnant over time. While he continually recommended that plaintiff participate in the suggested exercises, the undisputed record

shows Dr. Charles modified the plan on multiple occasions to include different approaches to his therapy: (1) on August 13, he added to the plan the opportunity to permit plaintiff the chance to express his feelings about the trauma; (2) on August 19, Dr. Charles concluded that he would need to consult with plaintiff's other providers because plaintiff seemed unwilling to work on the exercises; (3) on September 15, Dr. Charles noted that plaintiff was willing and able to work on the recommended assessments without experiencing vertigo; (4) on November 13, Dr. Charles provided plaintiff with cards meant to help him map out the days when he felt vertigo, to look for stress patterns; and (5) on December 22, Dr. Charles noted that session time would be spent walking through exposure activities to reduce negative reactions. (Ex. 1006 (dkt. #77-1) at 2-17.)

The court does not doubt that plaintiff's perceived lack of progress was frustrating, but these adjustments to plaintiff's therapy reflect that Dr. Charles was attempting to respond to how plaintiff was handling his therapy, not that Dr. Charles insisted that plaintiff continue with a method that was not, and could not, work. Regardless, in viewing his treatment record as a whole, it would be unreasonable for a trier of fact to conclude that Dr. Charles acted with deliberate indifference to plaintiff's serious medical need.

## C. Dr. Chapin

The result is the same as to Dr. Chapin. Plaintiff's overarching challenge to Dr. Chapin's treatment decisions is two-fold: (1) even though his symptoms did not improve over time, Dr. Chapin nonetheless refused to transfer him; and (2) Dr. Chapin's referral to Dr. Johnston for a new trauma group never came to fruition. Even accepting plaintiff's assertion that his symptoms did not improve, a reasonable fact finder could not conclude

that she exhibited deliberate indifference in viewing her treatment decisions between July 2014 and February 2015. For one, when Dr. Chapin first learned of plaintiff's complaints about his care in July of 2014, Chapin reviewed the treatment record and deemed Dr. Charles' decisions appropriate. More specifically, Dr. Chapin agreed that plaintiff should continue attempting to manage his symptoms related to taking the stairs. Dr. Chapin's similar response in August echoed that same approach. With respect to his incontinence, Dr. Chapin reminded plaintiff of the recommendations to decrease fluids at nighttime, as it was her professional opinion that his symptoms suggested a physical, not mental, issue with urine retention. Plaintiff has submitted no evidence or argument that this opinion was wholly inappropriate or lacking in professional judgment, much less amounted to deliberate indifference.[6]

As to the trauma group, Dr. Chapin could not control the fact that Dr. Johnston did not actually start a new trauma group at Waupun, similar to Dr. Charles' referral that did not end up working out. And with respect to Dr. Chapin's supposed decision to *deny* his request for a transfer to WRC, the evidence shows this simply was not Dr. Chapin's decision to make one way or the other. Plaintiff does not dispute that the decision to refer a prisoner to the WRC lies with Waupun's supervisory staff, nor that the WRC has the independent, ultimate authority to reject the referral. More importantly, Dr. Chapin believed that plaintiff's needs were being met at Waupun. Indeed, in recommending the denial of his request, Dr. Chapin explained that plaintiff had been seen in the PSU three

---

[6] Tellingly, much like other talk and pharmacological treatments recommended by Drs. Charles and Chapin, Oswald does *not* aver that he actually tried reducing his fluid intake at night.

weeks before, and that his clinicians were working with him on his assessments at that point in time. Accordingly, she found it prudent to keep him at Waupun. Again, while plaintiff may disagree with Dr. Chapin's exercise of her professional judgment, he cannot deny that he was receiving consistent responses to his requests for psychological care, just that he was not receiving the care he wanted. Yet the Eighth Amendment does not guarantee prisoners the best or even preferred, much less flawless, treatment. *Knight v. Wiseman,* 590 F.3d 458, 467 (7th Cir. 2009) (citing *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004)).

### D.    HSU Manager Schrubbe

Finally, Schrubbe's decisions related to plaintiff's access to the elevator and to anxiety medications did not exhibit deliberate indifference. Schrubbe first became involved in plaintiff's care after his fall starting in July of 2014, when she received plaintiff's information request for a cane and placement in a lower tier bunk. While plaintiff complains that Schrubbe should have given him an elevator pass at that point, the record shows that Schrubbe referred his request for elevator access to the Special Needs Committee for review; she also granted his requests for a cane and lower tier at that point. Given these undisputed actions, no reasonable jury could find that Schrubbe acted with deliberate indifference.

As an initial matter, Schrubbe lacked the independent authority to grant plaintiff access to an elevator; the DOC requires the Special Needs Committee to authorize the issuance of an access to a prisoner because his or her use of the elevator carries security concerns. *Dixon v. Godinez,* 114 F.3d 640, 645 (7th Cir. 1997) ("[O]fficials do not act with

'deliberate indifference' if they are helpless to correct the protested conditions."). When the Special Needs Committee eventually reviewed his request for an elevator pass on October 1, it was granted. Schrubbe only ended his access during plaintiff's stay in the Restrictive Housing Unit, because officers always used the hands on technique during transport, making the pass meaningless. If Schrubbe had denied plaintiff *any* sort of help in July of 2014, that could at least conceivably support a finding of deliberate indifference, but Schrubbe actually granted plaintiff's request for a cane and lower tier bunk, and sought authorization for his elevator access.

Additionally, plaintiff complains that Schrubbe failed to respond properly to his August 21, 2014, complaint about his anxiety medication. However, a reasonable fact finder could not conclude that her response was deliberately indifferent. Rather, the record shows that when Schrubbe received plaintiff's interview request on August 21, she reviewed Dr. Callister's prescription decision from that date. She then responded to plaintiff, explaining that even though Dr. Callister could prescribe him anxiety medications, he might not get exactly what he wanted. More specifically, Dr. Callister noted that while plaintiff was not interested in taking either mirtazapine or trazodone, because they "didn't work in the past" and he wanted something that would work immediately, Dr. Callister concluded that he could not safely accommodate that request. (Ex. 1007 (dkt. #77-1) at 339-40.)

At that point, an HSU Manager like Schrubbe was entitled to defer to Dr. Callister's medical judgment. *See Burse v. Komorowski*, 521 F. App'x 574, 577 (7th Cir. 2013) (prison administrators, one of whom was a nurse, were entitled to defer to treating physician's

course of treatment (citing *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008))). Indeed, as a health manager, it is hard to imagine what else Schrubbe should have done under the circumstances than try to help plaintiff understand that judgment, at least absent evidence that Schrubbe had an independent basis to doubt Dr. Callister's exercise of judgment. Moreover, even if Schrubbe had the authority to second guess a medical opinion, plaintiff's request to Schrubbe expressed only disagreement with the prescriptions he was receiving generally; he did not describe any specific or obvious problem he was experiencing in taking the medications that could raise a red flag to Schrubbe about the adequacy of his prescriptions. As such, a trier of fact could not reasonably conclude that Schrubbe's response to plaintiff's complaint about his anxiety medications -- or any of her other responses to his need for care -- exhibited deliberate indifference or negligence in responding to his communications about his care.

## III. Eighth Amendment conditions of confinement

Defendants next seek judgment on plaintiff's claim that Schrubbe violated his Eighth Amendment rights in allowing him to spend several days in urine-soaked clothes and linens. The Constitution requires the government to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To demonstrate that conditions of confinement violate the Constitution, a plaintiff must allege facts sufficient to satisfy a test involving both an objective and a

subjective component. *Farmer*, 511 U.S. at 834. The objective analysis concerns whether jail conditions result "in the denial of 'the minimal civilized measure of life's necessities,'" *id.* (quoting *Rhodes*, 452 U.S. at 347), or "exceed[] contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). The subjective component requires an allegation that jail officials acted with deliberate indifference to a substantial risk of serious harm to the plaintiff. *Id.* "Deliberate indifference" means that the officials knew that the plaintiff faced a substantial risk of serious harm yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 845–46. Thus, it is not enough if a plaintiff alleges that a defendant acted negligently or should have known of the risk. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

In this case, the objective component of this claim involves material factual disputes. Plaintiff represents that between July 3 and July 15, he only had one set of clothing and linens, and was unable to obtain an extra set of either item until the scheduled replacement times because staff simply responded that he should contact HSU. While plaintiff does not dispute that he could clean his clothes and linens, he explains that he would be violating prison policy if he washed them because he was required to remain clothed during mealtimes and when interacting with staff. Furthermore, plaintiff claims that his penis and groin were already injured by his being forced to wear soiled underwear, when his restriction was broadened on July 15 to include access to extra linens and adult diapers. As such, plaintiff's version of events between July 3 and 15 are arguably sufficient to create a factual dispute as to whether he was not only confronted with unhygienic conditions, but

was also unable to clean himself.  *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) ("allegations of unhygienic conditions, when combined with [a] failure to provide [prisoners] with a way to clean for themselves with running water or other supplies, state a claim for relief").

For plaintiff to avoid summary judgment, the record must also permit a reasonable fact finder to conclude that HSU Manager Schrubbe both knew that plaintiff did not have access to clean clothing and linens *and* failed to take reasonable measures to provide him access to clean clothes and linens.  This is where plaintiff's claim falters:  while the evidence of record permits a reasonable inference that Schrubbe knew about his incontinence by July 8, it would be unreasonable to conclude that she knew he was being denied the ability to clean up after himself, nor that her response exhibited a reckless disregard of his right to adequate conditions of confinement.

Plaintiff first claims generally that Schrubbe, as the HSU manager, had the authority to grant his requests sooner.  Yet the evidence of record does not support the conclusion that Schrubbe should be held liable by virtue of her position as supervisor.  In the context of a § 1983 claim, a supervisor may be held liable for unconstitutional conduct of underlings only if the supervisor *knew* about the conduct *and* facilitated it, approved it, condoned it or turned a blind eye to it.  *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).  Plaintiff does not suggest that Schrubbe had reason to know that any of her policies or practices violated his or other prisoners' constitutional rights.  Therefore, the court's focus is on Schrubbe's responses to plaintiff's complaints.

Plaintiff claims that Schrubbe learned that he suffered from incontinence sometime between July 4 and 8, 2014, when Dr. Charles emailed Schrubbe about plaintiff's request for a pee sheet and adult diapers. The evidence of record on summary judgment is even more precise than that: Dr. Charles emailed Schrubbe on Tuesday July 8, and Schrubbe responded the next day, July 9, that plaintiff should be instructed to write to HSU for those items. (Ex. 1009 (Dkt. #79-1) at 15.) The next day, July 10, plaintiff had an appointment with the HSU, at which point he received his medical restriction for an extra bath towel and washcloth. This restriction was modified again five days later, on July 15, to include access to extra bedding and incontinence briefs. Plaintiff does not dispute that he had the ability to request these additional items at that point, nor does he dispute that Schrubbe had no other reasons to know about his issues before Dr. Charles emailed her about them.

To be sure, there were multiple days in a row where it appears that plaintiff was dealing with incontinence and did not have access to additional linens, clothing or extra towels. However, there is no evidence that Schrubbe failed to act in a reasonable manner when Dr. Charles informed her about plaintiff's incontinence on July 8. To the contrary, the evidence suggests that Schrubbe's instruction that plaintiff contact HSU worked: within two days plaintiff had a medical restriction in place providing for an extra washcloth, towel and access to clean linens; and within a week, plaintiff also had access to adult diapers. Moreover, July 9 was a Wednesday, the day prisoners in the North Hall would receive a clean linens. Given that plaintiff has not averred either that he did not have access to clean linens that day or even more to the point, that *Schrubbe* had reason to know

that plaintiff would not receive clean linens that day, it would be unreasonable to infer as much. Again, while Schrubbe may have been capable of acting faster, in the circumstance where she promptly directed plaintiff to the HSU, which in turn provided the extra items he needed, it would be unreasonable to conclude that Schrubbe consciously disregarded plaintiff's need for extra linens, clothes and adult diapers.

## IV.     ADA and Rehabilitation Act

The court further granted plaintiff leave to proceed on an ADA/Rehabilitation Act claim against the DOC based on allegations in his complaint that he was (1) denied an elevator pass and (2) unable to use a shower. However, defendants point out that plaintiff's amended complaint does not contain allegations regarding a denial of an elevator pass. In any event, as previously discussed, plaintiff concedes he is pursuing an elevator pass claim in an Eastern District of Wisconsin lawsuit. Plaintiff has not only failed to respond to this argument, but similar to his claims against DeYoung, plaintiff is pursuing the merits of this claim in that lawsuit. *Oswald v. Manlove*, Case No. 16-cv-991-PP, dkt. #111, at 6-7. Accordingly, the court will deem any objection to this argument waived and grant defendants' request for judgment on this claim.

## V.     Qualified Immunity

Alternatively, defendants argue that qualified immunity shields each of them from liability for money damages. Qualified immunity protects  government employees from liability for civil damages for actions taken within the scope of their employment, unless

their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In determining whether a constitutional right has been clearly established, it is unnecessary for the particular violation in question to have been previously held unlawful." *Lewis v. McLean,* 864 F.3d 556, 563 (7th Cir. 2017) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "it has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Id.*

Here, plaintiff cites no authority suggesting that any of the defendants' treatment decisions or handling of his requests for care violated a clearly established right. Rather, plaintiff insists that the treatment decisions made by the defendants violated his rights because they had reason to know that their approach to his health care needs after his falls were not working. While the records of plaintiff's treatment reflect acknowledgement among his care providers that his symptoms were not consistently improving over time, those records also show that plaintiff's mental state improved during certain periods of time, while his providers were changing his medications and trying (often unsuccessfully) to get plaintiff to participate more actively in the exercises suggested for his therapy. This evidence does not support a reasonable finding that defendants were persisting in a course of treatment that they knew was not working, and thus defendants did not violate plaintiff's clearly established constitutional rights. To the extent his constitutional rights to good hygiene and treatment are still arguably a close call, therefore, qualified immunity shields Schrubbe, Dr. Charles, and Dr. Chapin from liability for money damages.

## VI.    State law claims

Finally, defendants seek judgment on plaintiff's Wisconsin professional negligence claims against Schrubbe and Drs. Charles and Chapin because he does not have an expert to testify that these defendants breached a standard of professional care.  *See Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.  While defendants accurately recite Wisconsin law on this point, plaintiff is proceeding *pro se*, and this court is unwilling to enter judgment against him based only on his inability to secure an expert to testify on his behalf.  That said, the evidence of record simply does not allow a reasonable trier of fact to find that any of these defendants actually breached their common law duty of care, nor that plaintiff suffered injury as a result.

As already discussed, the record shows that Schrubbe, Charles and Chapin each worked with plaintiff throughout 2014 and 2015 in attempts to address his mental and physical health needs.  While the evidence supports an inference that plaintiff continued to have difficulties with incontinence, and that he was frustrated by the side effects of the various medications Dr. Callister tried to address his anxiety, the evidence does *not* support an inference that these defendants actually breached their duty of care towards plaintiff.  Accordingly, judgment in their favor as to these claims is appropriate as well.

## VII.   Oswald's motion for assistance in recruiting counsel

One motion remains:  Oswald recently filed a renewed request for assistance in recruiting counsel.  (Dkt. #101.)  In it, plaintiff repeats the arguments that he previously advanced in this lawsuit:  (1) he cannot afford to hire counsel; (2) this case may require

expert testimony from a medical doctor or psychologist; and (3) he does not have sufficient knowledge of the law to address the complex issues in this lawsuit. To these arguments, Oswald now also adds a concern that defendants intend to take his deposition, and he may not be able to represent himself adequately because he is unfamiliar with deposition procedures.

As Oswald knows full well by now, there is no right to counsel in civil cases. *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014). Rather, a party who wants court assistance recruiting counsel must meet several requirements. *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir. 2010). While Oswald has established both that he is unable to afford counsel and that he has made reasonable efforts to find a lawyer on his own; it is still not apparent that this is one of those relatively few cases in which the legal and factual difficulty of the case exceeds the plaintiff's ability to prosecute it. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007).

This lawsuit is about whether the defendants acted with deliberate indifference and/or negligently with respect to: (1) the risk that Oswald might fall; (2) Oswald's serious medical and mental health needs; (3) the conditions in which Oswald was living; and (4) whether the DOC violated Oswald's rights under the ADA and Rehabilitation Act in failing to provide him with an elevator pass. Oswald's submissions in opposition to defendants' motion for summary judgment were well crafted and understandable, and he included as evidence a detailed affidavit setting forth his own version of the events comprising his claims. While Oswald was not ultimately successful, his opposition materials applied the

relevant legal standard to the facts and made reasoned arguments in support of his claims.[7]

Accordingly, once again, the court will deny Oswald's motion for assistance in recruiting counsel.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #73) is GRANTED.

2) Plaintiff Daniel Oswald's motion for assistance in recruiting counsel (dkt. #101) is DENIED.

3) The clerk of court is DIRECTED to enter judgment in defendants' favor and close this case.

Entered this 30th day of August, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[7] Oswald's concerns about not being represented by counsel at his stayed deposition is obviously mooted by this opinion.  Even if not moot, however, the court was unconvinced Oswald would need counsel to assist him.  Oswald is obviously aware of the rules of civil procedure and evidence, and the court is confident that Oswald would have been able to review and apply them in a deposition.